UNITED STATED BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

SEVEN STARS ON THE HUDSON CORP.

Debtor,
_____/

Case No.: 20-19106-SMG

Chapter 11

**MDG POWERLINE HOLDINGS, LLC'S (A) OBJECTION TO 3rd AMENDED PLAN OF REORGANIZATION FOR SMALL BUSINESS
AND
(B) SUPPLEMENTAL OBJECTION TO MOTION TO ASSUME UNEXPIRED LEASE OF NONRESIDENTIAL PROPERTY**

MDG Powerline Holdings, LLC ("MDG"), by and through undersigned counsel, objects to the Debtor's 3rd Amended Plan of Reorganization for Small Business [ECF No. 194](the "Plan") and submits its supplemental objection to the Debtor's Motion to Assume Unexpired Lease of Nonresidential Property [ECF No. 92] (the "Lease Motion").

**PRELIMINARY STATEMENT**

Confirmation of the Plan should be denied because the Debtor cannot meet its burden under section 1191 of the Code.  As explained below and will be demonstrated at the confirmation hearing, the Debtor cannot meet its burden to prove, with clear and convincing evidence, that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization.

In addition, and for similar reasons, the Lease Motion should be denied because the Debtor cannot meet its burden to provide adequate assurance of future performance under the Lease pursuant to section 365(b)(1)(C).

**BACKGROUND**

**The Plan**

1. On April 20, 2021, the Debtor filed the Plan. By the Plan, the Debtor seeks to reorganize as a subchapter V debtor by (a) restructuring its obligations owed to Wells Fargo, (b) stretching payments owed to the Broward County tax collector and (c) borrowing $225,000 of new funds the cure amounts owed to MDG (the "Post-Petition Loans"). In addition, the Plan provides for the payment of administrative expense claims upon the effective date of the Plan, other than payments owed to the Debtor's bankruptcy counsel (who has agreed to be paid over time).[1]

2. The Debtor obtained the Post-Petition Loans because it did not have sufficient cash on hand to pay the cure amount due under the Lease. In addition, neither of the principals of the Debtor have sufficient assets to inject the necessary amounts to pay the cure amount due under the Lease. Moreover, neither principal has the wherewithal to repay the $188,000 insider loan it took from the Debtor pre-petition. See Plan, p. 5, fn. 2.

3. The Debtor projects that it will earn approximately $24,000 of net income over the next three years after payments of the amounts due under the Plan. See ECF No. 210, Ex. 1.

**The Lease**

4. MDG and the Debtor entered into the Lease on or about November 23, 2015. The initial term of the Lease is for ten years. See ECF No. 157, Ex. A., p.1 and Section 2.03. Subject to separate obligations for taxes, utilities and operating expenses, the initial annual rent under the Lease was $340,000 through the end of the fifth year, at which time the annual rent payment increased in accordance with the terms of the Lease. See Ex. A, pp. 1-2. The

---

[1] Despite the Plan provision providing for the payment of all administrative expenses upon the effective date of the Plan, the Debtor's projections fail to include such payment. See ECF No. 209 (Second Amended Fee Application of Subchapter V Trustee).

obligations under the Lease are guaranteed by Jens Berding and Eddy Manzo-Berding pursuant to separate Lease Guaranty agreements entered into at the time of the Lease.

## ARGUMENT

### The Plan Cannot Be Confirmed Due to the Debtor's Failure to Demonstrate Feasibility

5. In order to confirm a plan under section 1191 of the Bankruptcy Code, the plan must meet all of the requirements of section 1129(a), other than paragraph 15 of such section (which is inapplicable here). See 11 U.S.C. §1191(a).

6. The Debtor has the burden of proving each element of 1129(a) is met based upon *clear and convincing* evidence. See In re Midland Plaza Assocs., 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000); In re Miami Center Assocs. Ltd., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992); In re D&G Invs. of W. Fla., Inc., 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006); SPCP Group, LLC v. Biggins, 465 B.R. 316, 324 (M.D. Fla. 2011).

7. In determining whether the Plan is feasible, the Court must consider the "earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation." See D&G, 342 B.R. at 886. While the Debtor need not offer a guarantee of success, it does need to provide a reasonable assurance of success and be workable. See Gros v. Walton, 12-61905-CIV, 2013 WL 3927826, at *3 (S.D. Fla. July 29, 2013) (cleaned up) (citing *In re Haas*, 162 F. 3d 1087, 1090 ("[t]he plan itself must offer a reasonable prospect of success and be workable.") (11th Cir. 1998)).

8. The Debtor's projections reflect that over the next 36 months the Debtor will generate a mere $24,000 of net income -- or, said another way, $667 per month. The Debtor

recently testified that (a) it had to borrow the money for the Post-Petition Loans,[2] and (b) its principals had no ability to repay the $188,000 they owe to the Debtor arising from a pre-petition loan. Thus, it is not debatable that the Debtor is operating on a razor-thin margin with no room whatsoever for a misstep in its business operations and, whether the Debtor can do so is questionable. And, what evidence there is certainly does not rise to the level of clear and convincing.

9. Per prior statements to the Court, both of the Debtor's principals have historically worked in the Debtor's business, including operations and management. However, within the last month (or two), Mr. Berding has stepped aside from direct involvement in the Debtor's operations. Indeed, his work with the Debtor is no more than half of what it was prior to him stepping aside. Thus, to the extent his prior services will be covered by other employees, those are not taken into account in the projections. Neither are any adjustments to the revenue side of the business, despite the fact that a key "operations" person will no longer be at the park on a daily basis. Moreover, there is no contingency built in for any disruptions in service that may be occasioned by the continued impacts of COVID-19, hurricanes or other external events.

10. In addition, the projections omit any expense for outside lawyers or accountants, despite testimony from the Debtor that is utilizes an outside accountant to prepare its tax returns. The projections also omit line items associated with re-branding the pylon/marquis with the name "Spacebound," which the Debtor estimates will cost between $4-6k.

11. Separate and apart from the numbers on the projections, based on the Debtor's acts in this case, it is questionable whether the projections can even be relied upon. For example, as the Court may recall, during the hearing on January 12, 2021 to continue the confirmation

---

[2] Although not previously disclosed to the Court, the Debtor testified under oath that a significant portion of the Post-Petition Loans are being funded by an insider related to one of the Debtor's principals.

hearing, MDG brought to the Court's attention that Mr. Berding, as the corporate representative of the Debtor, testified under oath the day prior to the hearing that the Debtor entered into an undisclosed insider sale transaction with Ms. Berding, a 25% shareholder of Debtor.

12. That transaction involved the sale of over 4,500 pairs of socks owned by Debtor to Ms. Berding in order for Debtor to have sufficient cash on hand to pay its obligations (the "Sock Transaction"). However, in the Debtor's December 2020 monthly operating report, which was filed more than a month after the deposition, Mr. Berding, under penalty of perjury, provided entirely conflicting answers to his prior sworn testimony under oath at his deposition. See ECF No. 131 (the "December MOR").

13. Question 12 of the December MOR asks whether Debtor has "sold or transferred any asset or provided services to anyone related to the DIP in any way?" Mr. Berding checked "No", which is clearly contradictory to his sworn testimony regarding the Sock Transaction. Id., p.1

14. Question 15 of the December MOR asks whether Debtor has "borrowed money from anyone or has anyone made payments on your behalf." Mr. Berding checked "Yes" and included a statement on Exhibit G that a payment was made by Eddy Manzo Berding on behalf of Debtor. Id., p.1 and p.5. Of course, as stated above, Mr. Berding testified under oath that the Sock Transaction was a sale to Ms. Berding and not a payment made on behalf of Debtor.[3]

### The Lease Cannot be Assumed Due to the Debtor's Failure to Demonstrate Adequate Assurance of Future Performance

15. Pursuant to section 365(a) of the Bankruptcy Code, subject to subsections (b), (c), and (d) of such section, a debtor may assume an unexpired, non-residential real estate lease.

---

[3] It is also worth noting as well that none of Debtor's monthly operating reports reflect the proceeds from "GoFundMe" page set up by Debtor. During his January deposition, Mr. Berding testified that all of the proceeds raised on that social funding site were paid directly to him. Although he testified that the proceeds were used to pay insurance expenses, to this date, no evidence or support has been provided to substantiate that testimony.

16. However, the right to assume an unexpired, non-residential real estate lease is not unlimited and a debtor must provide certain protections in favor of a landlord. A debtor may not assume an unexpired, non-residential real estate lease unless it (a) cures, or provides adequate assurance that it will promptly cure, any defaults under the Lease; (b) compensates, or provides adequate assurance of prompt compensation, to MDG for any actual pecuniary loss to MDG resulting from any defaults; and (c) provides adequate assurance of future performance under the Lease. See 11 U.S.C. § 365(b)(1).

17. Through the Post-Petition Loans, the Debtor has purportedly raised sufficient funds to cure the economic cure amounts due to MDG to cure the amounts owed under the Lease.

18. However, the Debtor has failed to provide adequate assurance of future performance under the Lease. See 11. U.S.C. §365(b)(1)(C).

19. Under the terms of the Lease, Debtor is obligated to spend no less than $25,000 per year on marketing expenses. In year 1 of the projections, the Debtor is $4,000 short of that amount. Moreover, in addition to the $25,000 per year direct marketing expense under the Lease, Debtor is obligated to reimburse Xtreme Action Park fifty percent (50%) of Xtreme's costs for joint marketing, in an amount not to exceed $25,000 per year. There is no budgeted amount for such reimbursements included in Debtor's projections.

20. It is Debtor's burden to demonstrate that there is adequate assurance of future performance under the Lease. See 11 U.S.C. § 365(b)(1)(C). Clearly, Debtor has not done so. Accordingly, the Lease Motion must be denied.

WHEREFORE, MDG respectfully requests that this Court (a) deny confirmation of the Plan, (b) deny the Lease Motion and deem that the Lease is rejected, and (c) grant such other

relief as the Court deems just and appropriate.

Dated: May 3, 2021

Respectfully submitted,

BILZIN SUMBERG BAENA
PRICE & AXELROD LLP
*Counsel for MDG Powerline Holdings, LLC*
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131
(305) 374-7580

By: /s/ *Jay M. Sakalo*
     Jay M. Sakalo
     Fla. Bar No. 156310

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF Notice of Electronic Filing to all Parties appearing in this case who are registered to receive electronic noticing in this case via CM/ECF on this 3rd day of May, 2021.

By: /s/ *Jay M. Sakalo*
Jay M. Sakalo